CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JAN 2 2 2020

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

LISSA MEDEIROS, et al.,     )
                      )
      Plaintiffs        )     Civil Action No. 5:19-CV-37
                      )
v.                   )
                      )
WAL-MART, INC.,        )     By: Michael F. Urbanski
                      )     Chief United States District Judge
      Defendant     )

## MEMORANDUM OPINION

Plaintiffs Lissa Medeiros, Stephanie Chapman, Melva Eldridge, Sharon Lancaster, Joyce Wilt, Shawna Jacobs, Denise Horton, and Beatrice Quirk filed this lawsuit on May 2, 2019, alleging that defendant Walmart, Inc. ("Walmart")[1] violated their rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"). Plaintiffs, all of whom are women, allege that Walmart discriminated against them on the basis of sex by paying them less than similarly-qualified or less-qualified men, and also by failing to promote them in numbers equal to men. Walmart filed a motion for partial dismissal of the claims on July 15, 2019, ECF No. 9, and the parties have fully briefed the issues. For the reasons discussed below, the court **GRANTS in part** and **DENIES in part** Walmart's motion to dismiss.

---

[1] Walmart changed its name from Wal-Mart Stores, Inc. to Walmart, Inc., effective February 1, 2018.

# BACKGROUND

## I. Introduction

Plaintiffs are current and former employees of Walmart who worked for the company at various times between 1991 and the present. All were members of a national class of plaintiffs made up of female Walmart employees who filed a lawsuit in 2001 in the United States District Court for the Northern District of California, alleging discrimination based on sex. Dukes v. Wal-mart Stores, Inc., No. 3:01-CV-02252, 2001 WL 1902806 (N.D. Cal., filed June 8, 2001). On June 20, 2011, the United States Supreme Court decertified the class, finding certification was not consistent with Rule 23(a) of the Federal Rules of Civil Procedure. Dukes v. Wal-Mart, 564 U.S. 338 (2001).

During the time the class was certified, the time periods for filing charges with the Equal Employment Opportunity Commission ("EEOC") were tolled. After the class was decertified by the Supreme Court, the District Court entered an order extending the tolling period for former class members for a limited time. All former class members who had received a notice to sue had until October 28, 2011 to file a lawsuit. All former class members who had never filed an EEOC charge had until January 27, 2012 to file a charge in those states with a 180-day time limit, and until May 25, 2012 in those states with a 300-day time limit.[2]

---

[2] The time limits for filing a charge are set forth as follows in 42 U.S.C. § 2000e-5(e)(1): A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.

Order, <u>Dukes v. Wal-Mart</u>, 2001 WL 1902806 (ECF No. 760). Plaintiffs in the instant case individually filed their EEOC charges between March 22, 2012 and May 22, 2012. All received their right-to-sue letters on May 2, 2019.

## II. Plaintiffs' Factual Allegations

All the plaintiffs worked for Walmart in Region 13, which is largely based in West Virginia, Delaware, Virginia, and Maryland. Each store had the same job categories, job descriptions, and management hierarchy.

The entry level hourly positions were cashier, sales associate, and stocker. Next in the hierarchy were hourly supervisor positions, including department manager and store manager. Walmart had a management trainee position ("MIT") which was a four-to-five-month program to prepare employees to be assistant managers, a salaried position. Each store had several assistant mangers and a store manager. Larger stores also had a co-manager. Further, Region 13 had a regional personnel manager who was responsible for promotion to the MIT program and also oversaw starting pay for MIT positions and assistant managers.

### A. Hourly Employees

From 1998 to 2004, store managers set pay for hourly employees by following guidelines governing compensation. Store managers reported to district managers who reviewed exceptions to the pay guidelines and pay decisions, such as starting an employee more than 6% above the minimum rate. District managers reported to the regional vice president and both positions had input into hourly compensation decisions and other management issues. The regional vice president had overall responsibility for pay increases for assistant managers and MIT positions.

3

Walmart sets compensation of store-based employees using a common set of guidelines which managers apply consistently throughout the stores where plaintiffs have worked. The guidelines establish standards for setting pay rates at hire and subsequent pay adjustments for hourly and salaried employees. From 1998 to 2004, Walmart assigned jobs to five classes with the top two used for only a few specialty jobs. Jobs were assigned to the same class regardless of department and each successive job class had a higher minimum starting pay rate.

The starting pay rates for each job class where plaintiffs worked were set for the stores with the approval of the district manager and regional vice president. Thereafter, an employee's pay could be adjusted after an initial probationary period; if the employee was promoted to a higher job class or into management; on an annual basis if the employee met minimum performance standards; or if the employee was awarded a special "merit" raise.

In the stores where plaintiffs have worked, the district managers, the regional personnel manager, and the regional vice president received regular reports of employees whose hourly pay in a job category was 10% below or 5% above the average pay in the category. District managers and the regional vice president had ultimate authority over the pay of hourly employees.

Plaintiffs allege that in the stores where they worked, managers were not required to use job-related criteria such as job performance or experience in setting, adjusting, or approving compensation for individual employees, and did not document the reasons for their pay decisions. The regional vice president and district managers did not hold the store managers accountable for the factors used in making compensation decisions and did not

require them to document the reasons for their compensation decisions. Moreover, Walmart did not specify the weight to be accorded to any particular requirement in setting or adjusting compensation.

Plaintiffs allege that women who held hourly positions in the stores where they worked have regularly been paid less than similarly situated men, although on average they have had more seniority and higher performance ratings than the men. Plaintiffs further allege that Walmart's compensation policies, including its policy of using a set of prescribed factors to set starting pay for hourly employees at a pay rate above minimum wage and the policy of setting pay adjustments based on an associate's prior pay, have an adverse impact on female employees.

In 2004, Walmart changed its pay structure and many jobs which had previously been in one pay class were assigned to separate classes depending on department. Pay rates differed depending on the pay class in which an hourly employee worked and therefore also were dependent on the department in which that employee worked. The proportion of women in various departments varied greatly, and plaintiffs assert that many departments in which women were over-represented were assigned to lower job classes, while those same job titles in departments over-represented by men were assigned to higher job classes. Thus, plaintiffs allege that the 2004 pay restructuring had an adverse impact on women's pay.

In 2005, Walmart started giving newly hired employees "credits" for prior work experience, with each credit worth more to employees in higher job classes. Plaintiffs allege that the application of the credit policy exacerbated the pay disparities and had an adverse impact on female employees. In 2006, Walmart capped the pay permitted for each job class,

further impacting the pay of women relegated to the lower job classes which had lower pay caps.

## B. Management Compensation

Walmart issued written guidelines governing management compensation and the guidelines were applied consistently throughout Region 13. In most circumstances, the guidelines prescribed a formula for setting starting pay rates which, because it was largely based on prior pay rates, perpetuated disparities in pay adverse to women. Exceptions to the starting pay rate could be sought and external hires were not subject to the same formula. In those circumstances the regional personnel manager decided the rate of pay.

Starting in 2002, the MIT pay rate for internal employees was based on their hourly pay rate, and plaintiffs assert that because women on average had lower hourly pay rates, their pay rates in the MIT program also were lower than similarly situated men. When employees successfully completed the MIT program and became assistant managers, their pay was set $2,000 above their MIT rate of pay. For women whose MIT rate of pay was based on a lower hourly rate of pay, their assistant manager rate of pay continued to be lower than that of similarly situated men. External hires were not subject to the same formula, but had their rates of pay set by the regional personnel manager. The rate of pay for assistant managers who were external hires into the MIT program also was linked to their pay while in the MIT program, but because their pay was not tied to their previous pay with Walmart, it created the opportunity for higher pay for them.

Performance pay increases for assistant managers were computed as a percentage of base pay, which plaintiffs claim served to perpetuate pay disparities for women. In addition,

performance reviews were conducted by the store manager and district manager and approved by the regional vice president, providing opportunities to incorporate bias and unfairly rate women lower than their peers. From 2002 to 2006, assistant managers also could receive merit pay increases which were computed as a percentage of their base pay rate, perpetuating prior disparities in pay.

Pay rates for co-managers were comprised of a base salary and profit sharing tied to the profitability of the store. Women have been assigned to stores that generate lower profits resulting in lower pay than their male counterparts. Pay rates for managers also are tied to store profitability, and the regional vice president assigned the stores at which the managers worked. Women have been assigned to stores that generate lower profits, resulting in their being paid less than their male counterparts. None of the plaintiffs in this lawsuit have worked as co-managers or managers.

## C. Promotion Policies

### (1) Support managers

Support managers are the highest level hourly supervisory position. There is no formal application process and no criteria for selecting a support manager. Most support manager positions are not posted or otherwise communicated to hourly associates within the store. The support manager position is often a stepping stone for employees seeking a salaried management position. Plaintiffs allege that women seeking such positions often are rejected out of hand for most openings in "masculine" departments such as sporting goods and hardware.

**(2) MIT Program and Salaried Management Positions**

Entry into the MIT program was required for advancement into assistant manager and other salaried management positions. Prior to 2003 there was no application process or job posting for MIT positions. Hourly employees were not given information about how to enter management positions or how to apply for the MIT program.

In 2003, Walmart established criteria for entering the MIT program, including a requirement that applicants be willing to relocate, despite the fact that such a willingness was not justified by business necessity. Plaintiffs aver that willingness to relocate was a factor known to deter women from pursuing such positions.

Applicants to the MIT program were required to agree to certain job conditions, such as being assigned to a store located up to a one-hour drive from home; travelling for up to six weeks; and replacing the requirement of a willingness to relocate with a statement that the greater the geographic area to which a candidate would move, the more likely the candidate would be promoted. Plaintiffs claim that all three requirements were more likely to discourage women than men from applying.

In 2007, Walmart started a new system for management promotions, including applications to the MIT program, in which employees could register in advance for the positions and geographic areas in which they were interested. When a vacancy was posted, the system automatically applied the minimum qualifications for the position to the group of employees who had expressed interest in the position and geographic area. Plaintiffs assert that it was common for managers to post positions, review the list of qualified candidates, and

close the posting without selecting anyone because the manager's pre-selected candidate was not included in the pool.

Plaintiffs also assert that despite changes to the MIT promotion process, two barriers to the selection of women remain. First, managers attempt to circumvent the posting process either by refusing to post for the positions or pre-selecting candidates. Second, the requirement that candidates be willing to relocate or accept comparable restrictions on travel and commuting distance has a disparate impact on women. In addition, plaintiffs assert that employees are not informed of the criteria for promotion, and managers do not require or use valid, job-related factors in making the promotion selection within the region, or specify the weight that is accorded requirements for promotion, all of which they claim results in qualified women being denied equal access to promotions because of their sex.

Plaintiffs assert that co-managers and managers are selected without the use of objective criteria and that Walmart does not document its promotion decisions. They claim that women in the districts and region where they have worked are far less likely than their male counterparts to receive promotion to management-track positions despite being equally or better qualified than their male counterparts who have been promoted.

### D. Individual Allegations

The individual plaintiffs make a number of allegations with regard to Walmart's pay structure and policies regarding promotion and each plaintiff's allegations will be described separately below.

**(1) Lissa Medeiros**

Plaintiff Medeiros is a resident of New Canton, Virginia and has worked at a Walmart in Gordonsville, Virginia since October 2011. From approximately October 1999 to September 2001 she worked at a Walmart in Seekonk, Massachusetts; from September 2001 through September 2010 she worked at a Walmart Supercenter in Fredericksburg, Virginia; and from September 2010 through October 2011, she worked at a Walmart Supercenter in Charlottesville, Virginia. Medeiros's titles included stocker on the overnight shift, unloading supervisor, support manager, and overnight support manager.

In 2005 or 2006, while Medeiros worked at the Walmart in Fredericksburg, Virginia as an overnight support manager, she earned $15.00 per hour. She had worked for Walmart for six or seven years and had received merit raises each year for good performance. During the 2005-2006 timeframe, Walmart hired a man named Charles Lloyd as an overnight support manager at the Fredericksburg, Virginia Walmart. Although Lloyd had never worked at Walmart and had no relevant experience, he was paid more than $17.00 per hour. When Lloyd transferred to the day shift where there was no overnight pay differential, he continued to earn more than Medeiros.

In 2011, while Medeiros worked at the Walmart in Charlottesville, Virginia, a male co-manager named Rob (last name unknown) rated Medeiros as "exceeds" on her evaluation, which resulted in a raise of $.50 per hour. For years preceding this evaluation, Medeiros had been rated as a "role model," which carried a $.60 per hour raise. When Medeiros complained about the evaluation, she was told by a female co-manager, Rosa Gibboney, who had more

tenure than Rob, that Rosa would have given her a "role model" rating. Nevertheless, Medeiros's rating and pay were not changed.

Medeiros saw men routinely promoted to positions for which they were not qualified. Walmart managers, co-managers, and assistant managers were almost always male, and would choose other men for assistant manager training, regardless of their qualifications, with the result that women rarely received the opportunity to become store managers or co-managers. Medeiros was never asked to participate in the MIT program, although she was qualified to do so.

Although Medeiros was trained and licensed on power equipment at Walmart by another woman, it is rare for a woman to receive such training or licensing. Medeiros usually is the only female in a Walmart store who is licensed on power equipment. Such training and licensing improve the chance of obtaining a promotion.

### (2) Stephanie Chapman

Plaintiff Chapman, a resident of Gerrardstown, West Virginia, worked at a Walmart in Martinsburg, West Virginia from approximately May 1991 through September 1997 and from January 2005 through April 2005. She also worked and at a Walmart in Charles Town, West Virginia from September 1997 through January 2005. Chapman worked as a department manager, general merchandise manager, and an assistant bakery manager.

In the winter of 1997 at the Charles Town Walmart, Clyde (last name unknown), who worked as the meat department manager, told Chapman that Marvin Riggs, the district food manager, advised Clyde that he "needed to get the women out of there because they didn't

know what they were doing." Riggs oversaw food merchandising at several stores and had the power to make personnel decisions at those stores.

In 1998, Chapman was hired as the deli manager at the Charles Town Walmart. Her starting salary was $27,500 per year, which was $2,000 less than the starting salary for men doing the same work in similar positions. Clint Miller, the store manager at Charles Town, told Chapman that the salary for general merchandise managers was $29,500, and two other male employees, the meat manager and the produce manager, told Chapman that their starting salaries each were $29,500. Brent Bryson, food merchandiser at the Charles Town Walmart, told a female employee who asked about the pay disparity that "men have families to support." During the time Chapman worked at the Charles Town Walmart, men received either four or four-and-a-half percent raises annually, while women received three or three-and-a-half percent raises annually for similar positions.

In 2001, Chapman applied for the position of general merchandise manager and was told by the store manager that she was not eligible for the $2000 per year additional salary that men in the same position earned. The manager did not give her a reason for the difference in pay. Also, at the Charles Town Walmart, a man and a woman began training for bakery positions at the same time and had the same culinary degree, experience, and qualifications. The man made $2,000 more per year than the woman.

### (3) Melva Eldridge

Plaintiff Eldridge worked at a Walmart in New Castle, Delaware from approximately March 1999 to September 2012. Her titles included department manager, jewelry coordinator, lead supervisor, and zone merchandise manager. In 2001, while Eldridge was a department

manager, she learned that two male department managers at the New Castle Walmart were making more than she was. In 2000, Eldridge made $9.53 per hour while Gerald Peterson made $11.75 per hour; in 2001 Eldridge made $9.95 per hour while Peterson made $12.34 per hour; in 2002 Eldridge made $10.35 per hour while Peterson made $13.34 per hour; and in 2003 Eldridge made $10.80 per hour while Peterson made $14.75 per hour. Another man, Dan (last name unknown), told Eldridge that he made two or three more dollars per hour than Eldridge, even though his position was only marginally higher than that of Eldridge. Two employees in the personnel department told Eldridge that women in the New Castle store were paid less than men who did the same work and had similar duties.

In approximately 2000 or 2001, Eldridge began applying for the support manager position at the New Castle store. David Rude, the New Castle store manager, was the selecting official. The first time Eldridge applied, Rude chose another employee. The second time Eldridge applied, she, along with another woman and a man, Edward Riley, were selected for the position. However, Eldridge and the other woman were never moved into the position and were told that Walmart was eliminating the position, even though Riley remained in the position. Eldridge had more experience than Riley and he worked under her as an associate in the household chemicals department when he started at Walmart. Rude later was fired from Walmart for falsely accusing Eldridge of stealing and having her strip searched.

In 2002 or 2003, Eldridge applied for the position of assistant store manager at the New Castle store, where Meral Cordray was the manager. The first time Eldridge applied and did not get the position, Cordray told her that he never received her application. The second time she applied, Cordray told her he lost her application. The third time she applied, she was

not given a reason for not being selected for the position. From 1999 until 2012, the New Castle Walmart had eight or nine managers but did not hire its first female manager until 2011.

### (4) Sharon Lancaster

Plaintiff Lancaster worked at a Walmart in Randallstown, Maryland for approximately one year, from 1996 to 1997; at a Walmart in Towson, Maryland from 2003 to 2007; and at a Walmart in Dundalk, Maryland, from 2007 to 2009. Her job title at all the stores was assistant manager.

In 2007 while Lancaster was working at the Walmart in Dundalk, she had more than 20 years of work experience and was paid $39,000 annually. At approximately the same time, a man, Brandon (last name unknown), also worked as assistant manager at the Dundalk store and was paid $45,000 annually, although he had only 10 years of work experience. In the same timeframe, another man, James (last name unknown), worked as an assistant manager and was paid $42,000 annually.

During the time Lancaster worked in Dundalk, Paul Kram was the store manager and based on information and belief, Kram gave raises to male employees but not to female employees. Lancaster spoke to many male employees who received raises, but Lancaster and another female employee, Carlene (last name unknown) did not receive raises. Lancaster asked Kram about the difference in the raises and he told her she did not deserve a raise and commented, "this is a man's world."

Kram also told Lancaster that women did not belong in management positions and that if she or another female employee wanted a management position they would need to transfer to another store. In addition, Kram belittled and sexually harassed female employees.

Lancaster reported Kram's behavior to a male human resources employee who oversaw the Dundalk store, and he told her that she was exaggerating and dismissed her complaint without investigation. Lancaster resigned in 2009 and Carlene resigned in 2010. As of 2010, there were no women in a position above assistant manager at the Dundalk Walmart.

### (5) Joyce Wilt

Plaintiff Wilt worked at a Walmart in Keyser, West Virginia from May 2, 2002 until she was terminated on June 9, 2010. In 2003, two of Wilt's male coworkers bragged about receiving merit pay increases. One of them said he had received a $.60 per hour raise while Wilt received only a $.20 per hour increase, despite having a better work performance and evaluations. Another mail coworker, hired two years after Wilt, bragged about making $13.00 per hour when Wilt was making $10.00 per hour. A different male coworker said he was making $16.00 per hour.

Assistant manager Mike Cohen stated that male and female employees understood that men were given raises because management believed they were providing for their families while women provided only supplemental income. In May 2003, Wilt transferred from the deli department to floor crew on the night shift. Six months after transferring, she asked Cohen why she never received a merit pay increase. Cohen said he would give her a merit pay increase but never did so. After requesting a merit pay increase from a female manager, Wilt received an increase of $.38 per hour.

From 2003 through 2010, Wilt complained to assistant managers about the differences in pay, work hours, and overtime opportunities between men and women. In Spring 2010, Wilt complained about the disparities to store manager Scott Corbin. During a staff meeting

in the Spring of 2010, Corbin asked if the associates would recommend working at the Keyser Walmart. Wilt responded that she would only recommend working at Walmart to men because they got paid more for doing less work. On June 9, 2010 Wilt was terminated for a minor time-clock infraction.

### (6) Denise Horton

Plaintiff Horton worked at a Walmart in Charles Town, West Virginia from September 16, 1997 through January 27, 2001. When she began working as a cashier in 1997 she was making approximately $7.25 per hour. When she left in 2001 she was making approximately $7.75 per hour. Despite frequently being scored as "perfect" on her yearly evaluations, she received only a $.10 per hour pay increase. The customer service manager lead told Horton that the small raise was all Walmart was willing to give and that other female customer service managers complained about the low pay. Horton also discovered that male employees who pushed shopping carts made more than she did by $.50 to $1.00 per hour. At least twice Horton applied for promotions to management positions, and had relevant fast food restaurant management experience, but men were chosen for both positions.

### (7) Beatrice Quirk

Plaintiff Quirk worked at a Walmart in South Boston, Virginia from the beginning of 1994 through the end of 1994; at a Walmart in Fredericksburg, Virginia from approximately 1995 through 1997; at a Walmart in Wareham, Massachusetts for three months in 1997; and at a Walmart in Fredericksburg, Virginia from 1997 to 2000. Her titles included associate in housewares, cashier, customer service associate, and photo lab associate and technician.

In early 2000, while working at the Fredericksburg Walmart, Quirk applied for the position of photo lab manager. At that time, she had five years' experience working at Walmart and three years' experience working as a photo lab associate and technician. The male district manager hired a man for the position who had two months' experience working in the photo lab and was not employed by Walmart at the time he was hired. As manager of the photo lab, the man made unwelcome sexual advances to a female employee and ultimately cornered the employee and hit her. The female employee reported it to the male store manager, who took no action against the photo lab manager, but fired the female employee shortly thereafter.

### (8) Shawna Jacobs

Plaintiff Jacobs worked at a Walmart in Culpeper, Virginia for about three months, from February or March 2010 until April or May, 2010. Jacobs learned that a male coworker, J.R. (last name unknown), was making $.60 more per hour than Jacobs, although he was hired at Walmart only two months before Jacobs and despite her having five years of retail experience before working at Walmart. Jacobs also learned that she was making less than two men who had the same job and responsibilities that she did except they were in general merchandise. Jacobs spoke to four different managers about the pay disparity but nothing was done and one manager told her she was making what she was supposed to be making.

Jacobs filed a complaint with the EEOC and thereafter believed she was harassed for filing the complaint. After being off work for a medical condition, she returned to Walmart and was supposed to be placed in a cashier position, but was told that no cashier positions were available, although cashiers were hired after she was returned to an associate position. Jacobs decided to resign but before doing so she talked to a female co-manager, who urged

her to stay. Jacobs told her that she was tired of men being paid more than she and the co-manager told her that she "was not going to get a fair chance" at Walmart. The co-manager told her that the men in management made $2,000 to $4,000 more than women.

## III. Causes of Action

### A. Disparate Treatment

Plaintiffs allege that Walmart violated Title VII by paying them less than similarly-qualified or less-qualified male employees, and by promoting them less quickly and less frequently than similarly-qualified or less-qualified male employees, resulting in the loss of past and future wages.

### B. Disparate Impact

Plaintiffs further allege that Walmart has maintained a system for making decisions about compensation and promotions that has had a disparate impact on its female employees, namely, its failure to require or use job-related criteria for making compensation decisions. They allege that Walmart's management-track policies, such as the absence of an open application process and job postings, relocation and travel requirements for management positions, scheduling requirements which deny managers a consistent schedule, and the failure to apply job-related objective criteria individually and collectively, have an adverse impact on women seeking promotions.

Plaintiffs also allege that Walmart has failed to create or maintain data that would allow analysis of the impact of each of the individual policies and practices and that Walmart does not specify the weight that should be accorded to each of the requirements for pay and promotion. Plaintiffs then argue that Walmart's compensation and promotion policies are thus

not capable of separation for analysis, meaning that the entire decision-making process for compensation and promotion decisions may be analyzed as one employment practice, citing 42 U.S.C. 2000e-2(k)(1)(B)(i).

In addition, plaintiffs allege that Walmart's compensation and promotion policies are not job-related or consistent with business necessity. In sum, plaintiffs allege that Walmart's compensation and promotion practices have denied them and other female employees in the stores where they have worked promotional opportunities and compensation to which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

## IV. Motion to Dismiss

In its motion for partial dismissal, Walmart asserts the following: (1) Horton's and Quirk's claims must be dismissed as untimely; (2) Quirk fails to state a claim for pay discrimination; (3) Chapman, Wilt, and Jacobs fail to state a claim for promotional discrimination; (4) Wilt failed to exhaust administrative remedies with respect to her claim of promotional discrimination; (5) Medeiros, Chapman, Eldridge, and Wilt failed to exhaust administrative remedies with respect to their disparate impact claim; (6) each plaintiff lacks standing to assert one or more disparate impact claims; (7) plaintiffs' pleadings fail to state a disparate impact claim; (8) it is implausible that the practices plaintiffs claim had a disparate impact are incapable of being separated for analysis; and (9) claims based on policies introduced in 2003 or later are precluded.

# ANALYSIS

## I. Rules 12(b)(1) and 12(b)(6)

Walmart moves to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). To move for dismissal under Rule 12(b)(1), a party must allege that the court lacks subject matter jurisdiction. When a defendant argues that a claim fails to allege facts upon which subject matter jurisdiction can be based, all the facts alleged in the complaint are assumed to be true and the plaintiff is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). When a defendant alleges that the jurisdictional allegations in a complaint are not true, a trial court may go beyond the allegations of the complaint and hold an evidentiary hearing to determine if there are facts to support the jurisdictional allegations. Id.

Walmart challenges the plaintiffs' standing to bring these claims and thus this court's jurisdiction under Rule 12(b)(1). When the jurisdictional facts are intertwined with the facts central to the merits of a dispute, courts generally assume jurisdiction and proceed to address the merits. Id.; Kerns v. United States, 585 F.3d 187, 193 (4th Cir. 2009). A trial court should dismiss under Rule 12(b)(1) only when jurisdictional allegations are "'clearly … immaterial, made solely for the purpose of obtaining jurisdiction or where such a claim is wholly unsubstantial and frivolous.'" Id. (quoting Bell v. Hood, 327 U.S. 678, 682 (1946)).

Walmart does not challenge the jurisdictional facts as untrue and therefore the allegations in the complaint are assumed to be true. The court finds that the plaintiffs' assertion of jurisdiction is inextricably tied to their allegations that their rights have been violated under

Title VII. Accordingly, the court will not dismiss their claims under Rule 12(b)(1), but will proceed to analyze their claims under Rule 12(b)(6).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual allegations, which, if accepted as true, "'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 ( 2007)). Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555. This plausibility standard requires a plaintiff to demonstrate more than "a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678.

When ruling on a motion to dismiss, the court accepts "the well-pled allegations of the complaint as true" and "construe[s] the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). While the court must accept as true all well-pled factual allegations, the same is not true for legal conclusions. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. A court need not accept as true "'legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement, . . . unwarranted inferences, unreasonable conclusions, or arguments.'" Richardson v. Shapiro, 751 F. App'x 346, 348 (4th Cir. 2018) (quoting Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009)) (internal quotation marks omitted). Thus, a complaint must present sufficient nonconclusory factual allegations to support a reasonable inference that the plaintiff is entitled to relief and the defendant is liable for the unlawful act or omission alleged. See e.g., Francis v. Giacomelli, 588 F.3d 186, 196-197

(4th Cir. 2009) (affirming dismissal of claim that simply stated a legal conclusion with no facts supporting the allegation); King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) ("Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim.") (quoting Iqbal, 556 U.S. at 679).

## II. Title VII

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex." 42 U.S.C. § 2000e-2(a)(1). Title VII prohibits both "overt discrimination," known as "disparate treatment discrimination," and "practices that are fair in form, but discriminatory in operation," known as "disparate impact discrimination." Barnett v. Technology Int'l, Inc., 1 F.Supp.2d 572, 576 (E.D. Va. 1998) (internal quotation marks omitted) (quoting Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971)).

A Title VII plaintiff alleging a disparate treatment pay disparity claim must allege intentional discrimination and may do so using direct or circumstantial evidence. Spencer v. Virginia State University, 919 F.3d 199, 207 (4th Cir. 2019). In the alternative, she may use the burden shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792(1973).[3]

---

[3] A prima facie pay disparity case under McDonnell Douglas requires a plaintiff to establish (1) that she is a member of a protected class; (2) she was performing her job in a satisfactory manner; (3) an adverse employment action occurred, and (4) the circumstances suggest an unlawfully discriminatory motive. Spencer, 919 F.3d at 207 (citing McDonnell Douglas, 411 U.S. at 802).

"[T]he plaintiff is not required to make out a prima facie case or satisfy any heightened pleading requirement at the motion to dismiss stage." Robinson v. Procter & Gamble Manufacturing Company, No. 1:18CV133, 2019 WL 1005504, *2 (M.D.N.C. 2019) (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002) and McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 584-85 (4th Cir. 2015)). But the plaintiff must plead facts that allow to the court to reasonably infer each element of the prima facie case, including that she was treated less favorably than similarly-situated employees outside the protected class. Id. (citing McCleary-Evans, 780 F.3d at 585). Where a prima facie case of wage discrimination is based on comparators, the plaintiff must show that she is paid less than men in similar jobs. Spencer, 919 F.3d at 207 (citing Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336, 343 (4th Cir. 1994)).

## A. EEOC Charge

Title VII gives initial enforcement action to the EEOC. A person alleging discrimination must first file an administrative charge with the EEOC within a certain time of the alleged unlawful act. Chacko v. Patuxent Inst., 429 F.3d 505, 508 (4th Cir. 2005) (citing 42 U.S.C. § 2000e-5(e)(1)). A charge is sufficient when it contains a written statement sufficiently precise to identify the parties and to describe generally the action or practices about which the claimant complains. 29 C.F.R. § 1601.12(b). After the charge has been filed, the EEOC investigates the allegations and provides notice of the charges to the employer within ten days. 42 U.S.C. § 2000e-5(b). If the EEOC finds reasonable cause to believe the allegations are true, it tries to eliminate the unlawful employment practice by informal methods of conference, conciliation, and persuasion. Id. The EEOC also may file a civil action against any respondent

which is not a government agency, or it may refer the matter to the Attorney General if the respondent is a government agency. If the EEOC declines to file a civil action, the claimant is informed and has ninety days to bring his or her own civil action. 42 U.S.C. § 2000e-5(f)(1). Thus, filing the administrative charge serves multiple purposes of notice to the employer of the alleged discrimination and initiating agency-monitored settlement or a civil action by the agency. Chacko, 429 F.3d at 510.

The administrative framework also plays a substantial role in focusing the formal litigation that may come afterward. Chacko, 429 F.3d at 509. "If 'the claims raised under Title VII exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred.'" Id. (quoting Dennis v. County of Fairfax, 55 F.3d 151, 156 (4th Cir. 1995)). "[A] plaintiff fails to exhaust his administrative remedies where . . . his administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit." Id. at 506.

However, "[t]he exhaustion requirement should not become a tripwire for hapless plaintiffs." Sydnor v. Fairfax County, Va., 681 F.3d 591, 594 (4th Cir. 2012). And, because documents filed by an employee with the EEOC should be construed, within the rules of permissible interpretation, to protect an employee's rights and statutory remedies, "'an administrative charge of discrimination does not strictly limit a Title VII suit which may follow.'" Id. (citing Miles v. Dell, Inc., 429 F.3d 480, 491 (4th Cir. 2005)). Nevertheless, "'[o]nly those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be

maintained in a subsequent Title VII lawsuit.'" Chacko, 429 F.3d at 506 (quoting Evans v. Techs. Applications and Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996)).

## B. Timeliness of Horton and Quirk EEOC Charges

In Amer. Pipe & Const. Co. v. Utah, 414 U.S. 538, 554 (1974), the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." Horton and Quirk argue that as members of the original class, their deadlines for filing charges with the EEOC were tolled while the certification was pending and that after the class was decertified, the tolling period was extended to May 25, 2012. Because they filed their EEOC charges on May 8, 2012 and May 22, 2012, respectively, they argue that their charges were timely filed.

Walmart asserts that although Horton and Quirk claim that they were part of the Dukes litigation prior to June 20, 2011, they actually were dismissed from the lawsuit on October 20, 2010, making their EEOC complaints filed in May 2012 untimely. Walmart cites Dukes, 564 U.S. at 348 n. 4, in support. In the note, the Supreme Court commented on an earlier action by the Ninth Circuit Court of Appeals and observed that the Court of Appeals had trimmed the Rule 23(b)(2) class by accepting Walmart's argument in part that since class members whom it no longer employed had no standing to seek injunctive or declaratory relief, as to them monetary claims must predominate.[4] The Court of Appeals then excluded from the

---

[4] One issue considered by all the courts in the Dukes litigation was whether certification of the class of Walmart employees was proper under Rule 23 of the Federal Rules of Civil Procedure. The 1.5 million members of the class, all female current or former employees of Walmart as of the date of the filing of the lawsuit, June 8, 2001, sought injunctive and declaratory relief, punitive damages, and backpay, but did not seek compensatory damages. Dukes, 564 U.S. at 345. At issue was whether monetary damages sought by the plaintiff class predominated over the injunctive and declaratory relief. Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571, 623 (9th

certified class "'those putative class members who were no longer Wal-Mart employees <u>at the</u> <u>time Plaintiffs' complaint was filed.</u>'" <u>Id.</u> (citing <u>Dukes</u>, 603 F.3d at 623) (emphasis in Court of Appeals opinion).

The category included Horton and Quirk because their employment ended prior to the time the case was filed. The Ninth Circuit indicated that on remand the district court could, in its discretion, certify a separate Rule 23(b)(3) class of former employees for back pay and punitive damages. Walmart contends that because Quirk and Horton ended their employment with Walmart prior to the filing of the original lawsuit, their claims were dismissed by the Ninth Circuit decision.

However, the only Circuit Court to address this issue determined that the claims of employees who stopped working for Walmart prior to the filing of the original lawsuit were not dismissed by the Ninth Circuit decision. In <u>Odle v. Wal-Mart Stores, Inc.</u>, 747 F.3d 315 (5th Cir. 2014), the Fifth Circuit Court of Appeals held that as to members of the putative Rule 23(b)(3) class of former Walmart employees, the Ninth Circuit's decision was not a "final adverse determination," and thus tolling did not cease as to them when the mandate issued. <u>Id.</u> at 323 (citing <u>American Pipe</u> and <u>Taylor v. United Parcel Serv., Inc.</u>, 554 F.3d 510 (5th Cir. 2008)). The court noted that Odle, who had stopped working for Walmart prior to the filing of the original lawsuit, was never a member of a decertified or vacated class, distinguishing her situation from that of class members in <u>Salazar Calderon v. Presidio Valley Farmers Ass'n</u>,

---

Cir. 2010)). The Ninth Circuit noted that former employees who were not working at the time the lawsuit was filed did not have standing to seek injunctive or declaratory relief. For that group of plaintiffs, it was "difficult to say that monetary relief does not predominate with respect to claims by plaintiffs who lack standing to seek injunctive or declaratory relief." <u>Dukes</u>, 603 F.3d at 623.

863 F.2d 384 (5th Cir. 1989) (per curiam), and <u>Hall v. Variable Annuity Live Ins. Co.</u>, 727 F.3d

372 (5th Cir. 2013). The court explained:

> Although the Ninth Circuit held that former employees could not proceed under Rule 23(b)(2), it required the California district court to make a Rule 23(b)(3) determination on remand, and therefore the Ninth Circuit's judgment was interlocutory as to the former employees. After the Ninth Circuit issued its mandate, Odle was a member of a putative Rule 23(b)(3) class with a pending request for certification.

<u>Odle</u>, 747 F.3d at 323 n. 44.

Walmart does not dispute that <u>Odle</u> held that employees who terminated their

employment prior to the commencement of the lawsuit were entitled to tolling of the statute

of limitations, but argues that the Fifth Circuit did not have the benefit of the Supreme

Court's opinion in <u>China Agritech, Inc. v. Resh</u>, 138 S.Ct. 1800 (2018). However, <u>China

Agritech</u> does not undermine the reasoning in <u>Odle</u> with respect to Horton and Quirk.

In <u>China Agritech</u>, the Supreme Court first noted the holding in <u>American Pipe</u>:

> [T]he timely filing of a class action tolls the applicable statute of limitations for all persons encompassed by the class complaint. Where class-action status has been denied, the Court further ruled, members of the failed class could timely intervene as individual plaintiffs in the still-pending action, shorn of its class characteristics.

<u>China Agritech</u>, 138 S.Ct. at 1804 (citing <u>Amer. Pipe</u>, 414 U.S. at 544). The Court then

examined the question of whether, upon denial of class certification and instead of joining an

existing suit or promptly filing an individual action, a putative class member could commence

a class action anew, beyond the time allowed by the applicable statute of limitations. <u>Id.</u> The

Supreme Court concluded that the statute of limitations for filing a subsequent class action

was not tolled by <u>American Pipe</u>.

The Supreme Court explained that American Pipe tolled the statute of limitations for individual class members and potential class members because a contrary rule would deprive Rule 23 class actions the main purpose of the rule—efficiency and economy of litigation. Individual litigants would feel compelled to file their own lawsuits to preserve their claims while class certification was under consideration and the statute of limitations was running. If the statute of limitations is tolled, individual litigants will pursue claims only if certification is denied. Id. at 1806-07.

However, tolling the limitations period for a possible subsequent class action while an initial class certification action was pending would not serve the same purpose. "The 'efficiency and economy of litigation' that support tolling of individual claims, American Pipe, 414 U.S. at 553, 94 S.Ct. 756, do not support maintenance of untimely successive class actions; any additional *class* filings should be made early on, soon after the commencement of the first action seeking class certification." China Agritech, 138 S.Ct. at 1806 (emphasis in original).

In this case, Horton and Quirk did not file an additional class action. Rather, they filed their subsequent action as individual plaintiffs. Accordingly, the reasoning and conclusion in Odle are applicable to their circumstances and China Agritech does not affect that outcome. Therefore, the court finds that their claims are timely.

### C. Quirk's Claim for Pay Discrimination

Walmart also claims that Quirk did not state a claim for pay discrimination, because she alleged only that during her tenure at Walmart, men earned more than similarly experienced and tenured women and earned raises more easily and frequently than did women. Quirk did not point to any similarly situated man who earned more than she did.

Quirk responds that under Swierkiewicz, 534 U.S. 506, she does not need to plead a prima facie case of discrimination, as long as she provided a short and plain statement of the claim showing she is entitled to relief. Quirk is correct that Swierkiewicz held that a plaintiff in an employment discrimination case need not plead specific facts establishing a prima facie case of discrimination. However, a plaintiff still must plead sufficient facts to give a defendant fair notice of the basis for the claim. Id. at 508, 514.

Under Iqbal and Twombly, a plaintiff must make a showing, rather than just a blanket assertion, of entitlement to relief and the showing must consist of enough facts to state a claim for relief that is plausible on its face. Twombly, 550 U.S. at 556 n. 3 and 570. In McCleary-Evans, 780 F.3d at 585, the Fourth Circuit found that a plaintiff failed to state a claim for discrimination based on race and gender when she alleged that the defendant did not hire her because of the decisionmakers' bias against African-American women. She claimed that during the course of the interview and based upon the employer's hiring history, the hiring officials predetermined to select White candidates. However, the plaintiff alleged no facts regarding what happened during the course of the interview to support the alleged conclusion. The court found that the plaintiff's "'naked'" allegations were a "'formulaic recitation'" of the necessary elements and no more than conclusions, which were insufficient to state a claim. Id. at 585-586 (quoting Iqbal, 556 U.S. at 678-679 and Twombly, 550 U.S. at 555, 557).

In this case, Quirk alleged generally that men earned more than similarly experienced and tenured women and earned raises more easily and frequently than did women. She did not allege any facts to support her allegations, such as her rate of pay compared to men at Walmart, and she did not name or describe any similarly situated men who earned more than she did.

Her bare allegations are too conclusory to state a claim under Iqbal and Twombly. For this reason, Quirk's complaint based on pay discrimination is **DISMISSED**.

### D. Promotional Discrimination

Walmart asserts that Chapman, Wilt, and Jacobs failed to state a claim for promotional discrimination and the plaintiffs concede that that this assertion is true. Accordingly, complaints of promotional discrimination brought by Chapman, Wilt, and Jacobs are **DISMISSED**.[5]

### E. Disparate Impact Claims

Some facially neutral employment practices may violate Title VII, even in the absence of discriminatory intent, when they have a disparate impact on otherwise qualified individuals. Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 988 (1988) (plurality opinion).[6] While disparate treatment claims focus on an employer's discriminatory intent, disparate impact claims focus on employment practices that produce discriminatory results. Jones v. Virginia Polytechnic Institute and State University, No. 7:17-cv-531, 2018 WL 4604563, *6 (W.D. Va. 2018) (citing Carpenter v. Va. Dep't of Transp., No. 5:06CV0035, 2006 WL 3314436, at *3 (W.D. Va. 2006) and Int'l Broth. Of Teamsters v. United States, 431 U.S. 324, 335 n. 15 (1977)). "The policy or practice contemplated by disparate impact doctrine consists of more

---

[5] Walmart also argues that Wilt did not exhaust her administrative remedies with regard to her claim of promotional discrimination. Because the claim is dismissed, the exhaustion argument as to this claim is not addressed.

[6] See also 42 U.S.C. § 2000e-2(k)(1)(A):

An unlawful employment practice based on disparate impact is established under this subchapter only if –

(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity....

than the mere occurrence of isolated or accidental or sporadic discriminatory acts, having reference instead to an employer's standard operating procedure[,] the regular rather than the unusual practice." Wright v. National Archives and Records Service, 609 F.2d 702, 712 (4th Cir. 1979) (internal citations and quotations omitted).

"To establish a prima facie case of disparate impact discrimination under Title VII, a plaintiff must show that the facially neutral employment practice had a significantly discriminatory impact." Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 265 (4th Cir. 2005). A plaintiff "'must begin by identifying the specific employment practice that is challenged.'" Dukes, 564 U.S. at 357 (quoting Watson, 487 U.S. at 994). "It is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact." Smith v. City of Jackson, Miss., 544 U.S. 228, 241 (2005). Instead, the employee must isolate and identify the specific employment practices that are allegedly responsible for the discrimination. Id. Then, "[a] plaintiff must allege either the existence of 'numerical or statistical evidence demonstrating disparate impact' or 'sufficient factual detail of a series of discrete episodes of the contested employment practice in order to raise a plausible inference that [the employment practice] has a discriminatory impact on [the protected group].'" Jones, 2018 WL 4604563 at *6 (quoting McCoy v. Canterbury, No. 3:10-0368, 2010 WL 5343298, at *5 (S.D.W. Va. Dec. 20, 2010)).

In appropriate cases, "giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory—since 'an employer's undisciplined system of subjective decisionmaking [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination.'" Dukes, 565 U.S at 355 (citing Watson, 487 U.S. at

990-91). However, a plaintiff must show that the challenged policy is the cause of the alleged disparity. <u>Walls v. City of Petersburg</u>, 895 F.2d 188, 191 (4th Cir. 1990) (citing <u>Watson</u>, 487 U.S. at 994).

Walmart brings four challenges to plaintiffs' claims of disparate impact discrimination: (i) failure to exhaust administrative remedies; (ii) lack of standing to bring a disparate impact claim; (iii) failure to state a claim for disparate impact discrimination; and (iv) failure to separately analyze the impact of various policies and practices with regard to their disparate impact claims. As discussed above, the court does not address the standing argument under Rule 12(b)(1) because it finds that the facts underlying the assertion of standing are intertwined with the facts on the merits. Thus, the court assumes that it has jurisdiction and analyzes the claims using the Rule 12(b)(6) standard. Also, because the court finds that plaintiffs have failed to state a claim for disparate impact discrimination, it does not analyze the parties' arguments on exhaustion or whether Walmart's policies and practices can be analyzed separately or only as a single employment policy.

### 1. Compensation Claims

With regard to hourly employees, plaintiffs assert generally that Walmart set compensation for store-based employees using a common set of guidelines "which Walmart's managers have applied consistently throughout the stores where Plaintiffs have worked." ECF No. 1 at ¶ 37. Store managers had the initial responsibility of setting pay rates for individual employees within the guidelines, subject to constraints by the district manager and regional vice president. <u>Id.</u> at ¶ 40. All hourly pay exceptions were automatically presented to the district manager for approval. The regional personnel manager "was also informed of all hourly pay

exceptions and was required to ensure that hourly compensation was consistent among employees in the Region." Id. at ¶ 42.

For management pay, plaintiffs also assert generally that Walmart issued written guidelines governing management compensation and the guidelines applied consistently throughout Region 13. Id. at ¶ 54. Because most of the management pay rates were based on prior pay rates, plaintiffs assert that the result was that female managers received lower pay than male managers because their starting pay rates were lower than those of the male employees. Exceptions to managerial pay rates were approved by the regional personnel manager.

The crux of plaintiffs' complaint is that notwithstanding the oversight by district and regional managers, "in stores where Plaintiffs have worked, managers were not required to use job-related criteria, such as job performance or experience, in setting, adjusting, or approving compensation for individual employees." Id. at ¶ 45. Assuming this lack of reliance on job-related criteria is the basis for plaintiffs' disparate impact claim, they still must show that the policy or practice resulted in women being paid less than men, either by statistical evidence or describing a series of discrete episodes of the contested employment practice. See Watson, 487 U.S. at 990 ("It is true, to be sure, that an employer's policy of leaving promotion decisions to the unchecked discretion of lower level supervisors should itself raise no inference of discriminatory conduct.")

Plaintiffs in this case have not pled facts that would allow this court to reach such a conclusion. First, they have not asserted the existence of statistical evidence to back up their claims. Second, in describing their individual claims, they set forth their rates of pay and

compare them to pay for men they assert are similarly situated. Plaintiffs attempt to tie their pay disparities to the fact that managers were not required to use job-related criteria in making their decisions, but Walmart set pay ranges for different classes and departments, and in doing so presumably took into consideration job related criteria. In any event, the fact that pay was set by Walmart for different jobs and that exceptions to the pay ranges were reviewed by managers means that Walmart did not allow managers to exercise unfettered discretion in setting pay for either hourly or salaried employees.

Moreover, in plaintiffs' individual claims, they attribute their lower pay to managers' attitudes and stereotypes about women. If Walmart had compensation formulas for hourly and managerial employees designed to make compensation fair, but managers either ignored the policies or deviated from them to pay men more than women, it is not the neutral policies that are to blame. Rather, the managers have ignored the policies and treated female employees differently from male employees and thus, plaintiffs have stated a claim for disparate treatment, rather than disparate impact, with regard to compensation.

Accordingly, plaintiffs' disparate impact claims based on their allegations of pay disparities are **DISMISSED**.

### 2. Promotion Claims

Walmart argues that none of the plaintiffs have alleged facts sufficient to state a claim under a disparate impact theory of promotion because no plaintiff pled facts to suggest any of the policies described in the complaint disproportionately affect women with respect to promotional opportunities. Plaintiffs assert generally that prior to 2003 there was no formal application process for either support managers or the MIT program at Walmart, both of

which were considered steps on the path to higher-level management positions, and that the mostly male store managers exercised a great deal of discretion in their selection of candidates. They further allege that even after Walmart began to use a more standardized selection process for management and MIT positions, store managers routinely circumvented the procedures in order to promote their pre-selected candidates. Also, plaintiffs claim that the criteria for promotion are not made available to them and managers do not use valid, job-related criteria in making selections for promotion.

As in the pay disparity claims, the gravamen of plaintiffs' claims is that Walmart allowed managers to have too much discretion in making promotion decisions. Assuming plaintiffs have identified a neutral policy that they believe resulted in discrimination, they must either allege the existence of numerical or statistical evidence demonstrating a disparate impact, or describe a series of discrete episodes of the contested employment practice that raise a plausible inference that the promotion policies have a discriminatory impact on women.

Plaintiffs have provided no statistical evidence and their individual allegations undermine their disparate impact claims. For example, plaintiff Medeiros held two support management positions, despite the lack of formal application process and criteria for selection. Chapman worked as a department manager, general merchandise manager, and deli manager. Eldridge worked as a department manager and zone merchandise manager. Lancaster worked as an assistant manager at three different Walmart stores. Although Lancaster alleges that the store manager at one Walmart store told her that women did not belong in management positions, she did not allege that was denied a management position.

To be sure, Horton, Quirk, and Eldridge applied for management positions for which they were not chosen, and Medeiros was not invited to participate in the MIT program. But in the context of their overall allegations, they have not described a series of events sufficient to give rise to a plausible inference that the fact that managers have discretion in making promotions has had a discriminatory impact on women. See Wright, 609 F.2d at 712-713 (finding plaintiff failed to make out a claim disparate impact discrimination when the number of affected persons was small and some members of the group were not negatively affected by the neutral policy). If anything, plaintiffs have described facts consistent with a disparate treatment theory of discrimination. For these reasons, plaintiffs' causes of action for disparate impact discrimination are **DISMISSED**.

### 3. Claims Based on Policies Introduced in 2003 or Later

Walmart contends that Chapman, Lancaster, Wilt, and Jacobs did not timely file an EEOC charge covering policies implemented in 2003 and later. However, Walmart's argument addresses policies that were enacted after 2003, rather than individual actions taken by management or supervisors. The court interprets the argument to apply only to plaintiffs' disparate impact claims and not to their disparate treatment claims. Because the disparate impact claims are dismissed, the court does not reach the timeliness argument.

Walmart also asserts that the allegations in plaintiffs' lawsuit go beyond the scope of their charges because they did not address the 2003 job posting system, 2004 pay restructuring, 2005 new hire credits, 2006 pay cap, and the 2007 changes to the promotional system. Again, because this argument pertains to plaintiffs' disparate impact claims, the court does not find it necessary to address it.

## CONCLUSION

Based on the foregoing, the court **GRANTS in part** and **DENIES in part** Walmart's motion to dismiss, ECF No. 9.

(1) Horton's and Quirk's claims are not time-barred;

(2) Quirk's claim for pay discrimination is **DISMISSED** for failure to state a claim;

(3) Chapman's, Wilt's, and Jacobs's failure-to-promote claims are **DISMISSED** for failure to state a claim;

(4) All plaintiffs' claims for disparate impact discrimination are **DISMISSED** for failure to state a claim.

Plaintiffs' disparate treatment claims may go forward, with the exception of Quirk's claim for pay discrimination and Chapman's, Wilt's and Jacobs's claims for promotion discrimination.

An appropriate order will be entered.

It is so **ORDERED**.

Entered: 01-22-2020

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge