UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| LISSA MEDEIROS, | ) |
| Plaintiff, | ) Civil Action No. 5:19-cv-00037 |
| v. | ) **MEMORANDUM OPINION** |
| WALMART, INC., | ) By: Hon. Thomas T. Cullen |
| | ) United States District Judge |
| Defendant. | ) |

Plaintiff Lissa Medeiros, a long-time employee of Defendant Walmart, Inc., brought this lawsuit under Title VII of the Civil Rights Act, alleging that Walmart discriminated against her on the basis of sex. Walmart now moves for summary judgment on Medeiros's remaining claim for pay and promotional discrimination. The court heard oral argument on April 6, 2021, and the matter is now ripe for disposition. Medeiros fails to surpass even the first hurdle of stating a *prima facie* case of discrimination and has not demonstrated any genuine issue of material fact. The court will therefore grant Walmart's motion for summary judgment.

## I. BACKGROUND

### A. Relevant Walmart Policies

All Walmart employees are subject to long-standing compensation practices. These practices are not disputed in this case and are critical to assessing Medeiros's claim.

Each Walmart store has its own pay structure, which is reviewed annually to ensure that it remains competitive in each store's respective labor market. (Decl. of Lisa Riley ¶¶ 9–

1

10, Jan. 26, 2021 [ECF No. 55-1].) In that pay structure, every associate's position is assigned to a particular "pay class" based on his or her job responsibilities, and jobs in the same pay class have the same minimum starting wage. (*Id.* ¶¶ 11–12.) While an associate must be paid at least that minimum wage, Assistant Store Managers, who typically set an associate's starting wage, can increase an associate's wage based on additional skills, experience, or education. (*Id.* ¶¶ 13–14.)

After an associate starts, there are further opportunities for pay increases: (1) after a 90-day evaluation; (2) after annual performance evaluations, which are generally completed by the Assistant Store Manager or Co-Manager responsible for overseeing the associate's department and co-signed by the associate's hourly supervisor[1]; (3) if an associate receives a "merit increase" for "exceptional performance" or for accepting additional responsibilities (*e.g.*, joining a Safety Team)[2]; (4) if the associate is promoted or moved into a higher pay class; and (5) if a facility's pay structure is modified to stay competitive in a market. (*Id.* ¶¶ 15–16, 18–20.) The result is that "it is not uncommon for associates in the same position at a given time to have differing rates of pay." (*Id.* ¶ 22.) Additionally, "associates in the same pay class whose employment history at Walmart includes working at different stores may have different rates due to variances between the local facility rates, market conditions, and decision-makers at the various stores where they have worked over the course of their careers." (*Id.*)

Walmart's management framework is also relevant to the present analysis. Each

---

[1] The amount of the pay increase corresponds to the performance rating that an employee receives, as set forth in Walmart's Compensation Guidelines. (*See* Riley Decl. ¶ 17.) Until June 2004, pay increases were set in percentages, but beginning in June 2004, they were set in dollar amounts. (*Id.*)

[2] This was relevant only prior to 2006. (Riley Decl. ¶ 19.)

Walmart store has one Store Manager. (*Id.* ¶ 7.) Some stores have Co-Managers (mid-level salaried management), and other stores have Area Managers and/or Assistant Store Managers (the lowest levels of salaried employment). (*Id.*) Store Managers make "key decisions within the store, while delegating many responsibilities to other salaried managers within their store, including Area Managers, [Assistant Store Managers,] and/or Co-Managers." (*Id.*)

To become an Assistant Store Manager, an associate must be selected for and complete Walmart's Management in Training ("MIT") program. (*Id.* ¶¶ 23, 25.) Any interested associate can apply and can discuss the opportunity with his or her Store Manager or other salaried members of management. (*Id.* ¶¶ 23, 26.) Managers can also raise promotions in an associate's annual performance evaluation. (*Id.*) Market Managers (another higher level of management) are responsible for interviewing and selecting associates for the MIT program. (*Id.* ¶ 24.) If there is a program opening, the Market Manager will contact an applicant's Store Manager to see if he or she recommends the associate. (*Id.*) If recommended, the associate can interview with the Market Manager, who will determine if the associate should be selected for the position. (*Id.*)

Further, Walmart initiated its online "Career Preference" program in 2006 to manage promotions. (*Id.* ¶ 27.) In that system, an associate can apply for jobs in advance by listing them as an "Interest" in the system. (*Id.*) When a position opens, the database will automatically match qualified and interested associates for the position. (*Id.*)

**B.     Medeiros's Walmart Employment History**

Medeiros worked in five Walmart locations. First, from October 1999 to September 2001, Medeiros worked for a Walmart in Seekonk, Massachusetts. (*Id.* ¶¶ 28, 31.) She was hired as an overnight stocker and unloader, starting at $8.75 per hour. (*Id.* ¶ 28.) She received four incremental raises at that store and assumed additional responsibilities, reaching a wage of $10.46 per hour. (*Id.* ¶¶ 29–32.)

Second, in September 2001, Medeiros transferred to a Walmart in Fredericksburg, Virginia, where she remained until September 2009. (*Id.* ¶¶ 33, 51.) She still worked as an unloader, and her previous pay rate carried over. (*Id.* ¶ 33.) In January 2002, Medeiros was promoted to "Overnight Support Manager."[3] Through this promotion and other merit raises, Medeiros's pay rate eventually increased to $18.53 per hour at the Fredericksburg store. (*Id.* ¶¶ 36–39.) Medeiros received the following performance evaluations—and corresponding pay increases—at the Fredericksburg store:

| Year | Position | Rating | Pay Increase | Evaluating Manager |
|---|---|---|---|---|
| 2001 | Unloader | Meets Expectations | 4% | Joel Payne |
| 2002 | O/N Support Manager | Exceeds Expectations | 5% | John Jennings |
| 2003 | O/N Support Manager | Exceeds Expectations | 5% | Melodi Welborn |
| 2004 | O/N Support Manager | Exceeds Expectations | $0.55 | Galen Lutz |
| 2005 | O/N Support Manager | Exceeds Expectations | $0.55 | Theresa Kunneman |
| 2006 | O/N Support Manager | Exceeds Expectations | $0.60 | Karen Decker |
| 2007 | O/N Support Manager | Exceeds Expectations | $0.60 | Sheila Price |
| 2008 | O/N Support Manager | Exceeds Expectations | $0.60 | Sheila Price |
| 2009 | O/N Support Manager | Role Model[4] | $0.60[5] | Maddalena Witham |

---

[3] Medeiros's employment records show that she also worked as an "Office Associate" and an "Overnight Stocker" at the Fredericksburg store, but those changes in position did not impact her pay. (Riley Decl. ¶ 35.)

[4] In 2009, Walmart added the new category of "Role Model" for performance evaluations, which is one step above "Exceeds Expectations." (Riley Decl. ¶ 37 n.3.) An "Exceeds Expectations" rating warrants a $0.50 raise, whereas a "Role Model" rating warrants a $0.60 raise.

(*Id.* ¶ 37.)

Third, in September 2009, Medeiros transferred to a Walmart in Charlottesville, Virginia, with no change in pay. (*Id.* ¶ 51.) While she worked there, she received (1) a $0.60 per hour pay increase in November 2009, based on the "Role Model" evaluation she received in the Fredericksburg store (noted in the above chart); and (2) another $0.60 per hour increase in November 2010, after a second "Role Model" annual performance evaluation from the Charlottesville store. (*Id.* ¶ 52.) In September 2011, Medeiros received an "Exceeds Expectations" annual performance evaluation. (*Id.* ¶ 53.) A Co-Manager, Michelle Neighbors-Acoff, signed the evaluation, and an hourly supervisor, Theresa Bays, co-signed the evaluation. (*Id.* ¶ 54.) On that second evaluation, Medeiros wrote:

> My [evaluation] is unfair, not all my [management] had input on my [evaluation.] I'm running one side of the store when [Co-Managers] and [Assistant Store Managers] run [*unintelligible*]. I'm left by myself on 1st of the month. I walk into backroom packed with freight and when I leave it is not. My [evaluation] is based on management who has worked with me for only six months. I make better calls than my bosses do. My [evaluation] is being base[d] on what my management is not doing.

(*Id.* ¶ 55, Ex. 17.) In her responses to interrogatories, Medeiros contends that this was one instance of sex discrimination. (*See* ECF No. 55-3 at 6–7.) She states that a male Co-Manager, Rob, wrote the evaluation. (*Id.*) Medeiros claims that she complained about the rating to Rosa Gibboney, a Co-Manager who had worked there longer than Rob. (*Id.*) According to Medeiros, Gibboney informed her that Rob wrote the evaluation without asking for her input, but that she would have given Medeiros a "Role Model" rating. (*Id.*)

---

[5] Medeiros transferred to the Charlottesville store before her 2009 pay increase took effect. (Riley Decl. ¶ 37 n.4.)

Gibboney, however, disputed Medeiros's account at her deposition:

> Q [Y]ou told Miss Medeiros that Rob had written her evaluation without asking for you input; is that correct?
> A No, that's incorrect.
> Q You remember that fact?
> A I remember that fact.
> Q You remember that conversation?
> A I remember that conversation clearly. And once again, as I stated before, she worked for Rob longer than she worked for me. Therefore, that's why he wrote the evaluation for her and she knew that they—what she needed to do, which was the open door [policy]. She could have never done the open door [policy] with me because I was equal with Rob.

(Dep. of Rosa Gibboney at 27:22–28:13, Jan. 26, 2021 [ECF No. 55-4].) Gibboney reiterated:

> So Rob was there before me. So [Medeiros] actually worked under Rob that year, not under me. And if so, that was the reason that he wrote the evaluation for her. And she could not complain to me because I was the same rank as Rob. So if I knew that we were being unfair or he was being unfair, she could have always done the open door [policy], and the open door would have been going to the store manager.

(*Id.* at 25:4–12.) Medeiros complained to the Store Manager about her evaluation, but the Store Manager declined to change her rating. (Medeiros Dep. at 101:12–102:20.) Medeiros decided to leave the Charlottesville store because of this evaluation. (*Id.* at 102:21–23.) At her deposition, she testified as follows:

> Q. What was your issue with Charlottesville?
> A . . . I did a lot – I did so much work that let's just say that it made their jobs really easy, so when my evaluation came up, I had assumed that I would have received the Role Model evaluation, and when I received my evaluation, it was not Role Model; it was Exceeds, so it was a ten cent difference so I was 50 cents instead of 60 cents, and I had an issue with it, knowing that I worked so hard that year, and then I realized that the manager who signed off on that was co-manager Rob and I

6

> actually worked more with co-manager Rosa, and I was really upset and I informed her about it, and she informed me that she was never -- I think when it was done, her input either wasn't given or it was given and she thought that I deserved a Role Model but he chose to put me down for an Exceeds, so I went to the store manager about it. She was brand new to the store, so she didn't know my performance history. I was frustrated because I felt like at that point I'm just getting kind of used, so I decided that I was going to make my transfer to the Gordonsville store.

(*Id.* at 46:18–47:19.)

Fourth, from October 2011 to July 2012, Medeiros worked at a Walmart in Gordonsville, Virginia. (Riley Decl. ¶¶ 56, 60.) In November 2011, she received a $0.50 per hour pay increase, based on the "Exceeds Expectations" evaluation from the Charlottesville store. (*Id.* ¶ 57.) Medeiros then received an "Exceeds Expectations" rating on her 2012 annual performance evaluation in the Gordonsville store. (*Id.* ¶ 59.) In the comments, she wrote, "I Exceed At Being A Role Model." (*Id.*, Ex. 18.)

Finally, in July 2012, Medeiros voluntarily transferred to a Walmart Distribution Center, where she works to this day. (*Id.* ¶¶ 60–61; Medeiros Dep. 56:4–57:7; *id.* at 66:10–67:6.)

C.  **Charles Lloyd: Pay Comparator**

The crux of Medeiros's pay discrimination claim, apart from the 2011 performance evaluation discussed above, relates to one of Medeiros's male colleagues, Charles Lloyd. Medeiros and Lloyd overlapped as Support Managers at the Fredericksburg store from July 30, 2005 to September 30, 2005, and again from July 26, 2008 to September 11, 2009. (Riley Decl. ¶ 40.) In support of her claim, Medeiros asserts that Lloyd was an "external applicant" hired to be a Support Manager. (ECF No. 55-3 at 6.) She further asserts that "[a]t this time

7

[in 2005,] Medeiros was earning a little more than $15 per hour as a support manager. . . . Despite the fact that Mr. Lloyd had never worked at Walmart and had no other relevant experience, he was paid more than $17 per hour." (*Id.*) Finally, Medeiros asserts that even when Mr. Lloyd transferred to a day-shift position as a department manager, where there was no overnight pay differential, he still earned more than Medeiros. (*Id.*)

Contrary to this assertion, Lloyd's employment records show that he was originally hired by the Fredericksburg store in July 2002 for a stocking position, and an Assistant Store Manager named Jeannie McCloy interviewed him and set his initial pay rate. (*Id.* ¶¶ 41–42.) He resigned several months later, in September 2002, but was rehired in October 2002 in "Night Receiving (Division 28 – Grocery)." (*Id.* ¶ 43.) In July 2005, Lloyd transferred to Overnight Support Manager—the same position that Medeiros held—and maintained the pay rate of $17.30 per hour that had been set for him by his supervisors in Grocery Night Receiving. (*Id.* ¶ 45.) Medeiros and Lloyd therefore both held the title of Overnight Support Manager, but they had different rates of pay. In October 2005, Lloyd transferred to the position of Dairy Department Manager. (*Id.* ¶ 46.) In July 2008, Lloyd became a Support Manager again with $0.50 per hour pay increase to $18.88 per hour. (*Id.* ¶ 47.) When Medeiros transferred out of the Fredericksburg store, Lloyd's pay rate was $19.48 per hour. (*Id.* ¶ 50.) The following is a chart of Lloyd's performance evaluation ratings and corresponding pay increases, mirroring the one produced above for Medeiros (minus the year 2001):

| Year | Position | Rating | Pay Increase | Evaluating Manager |
|------|----------|--------|--------------|--------------------|
| 2002 | Grocery Night Receiving | Meets Expectations | 4% | Jeannie McCloy |
| 2003 | Grocery Night Receiving | Meets Expectations | 4% | *Illegible* |
| 2004 | Night Receiving (O/N Grocery Lead) | Exceeds Expectations | $0.55 | Janet Bustos |
| 2005 | O/N Support Manager | Exceeds Expectations | $0.65[6] | *Illegible* |
| 2006 | Dep't Mgr. – Dairy | Meets Expectations | $0.40 | Theresa Kunneman |
| 2007 | Dep't Mrg. – Dairy | Meets Expectations | $0.13 | John Mudryk |
| 2008 | Support Manager | Exceeds Expectations | $0.60 | Bill Harris |
| 2009 | Support Manager | Exceeds Expectations | $0.50 | David Lewis |

(*Id.* ¶ 48.)

At the Fredericksburg store, Medeiros complained to her direct supervisors about this pay discrepancy. She "expressed . . . that it wasn't fair that a support manager was hired making more money than [her] when [she] was clearly doing the job at that store for quite some time." (Medeiros Dep. 32:7–12.) She stated in her deposition that she spoke to her Assistant Store Manager, John Jennings, but could not remember the other manager she spoke to (as they frequently changed). (*Id.* at 31:13–32:12.) Mr. Jennings responded that he had not hired Mr. Lloyd, and that he did not know anything about it. (*Id.* at 32:14–20.) Medeiros also confided in another daytime Assistant Store Manager, Patty Boyle, who expressed that she understood and that it "was not right." (*Id.* 33:4–34:1.) However, regarding Ms. Boyle, Medeiros stated: "I didn't go to her thinking that she was going to take it higher or tell someone else. I just went to her to just blow off some steam and let her know this is what's going on at night, get[ting] her input." (*Id.* at 90:23–91:3; *see also id.* at 33:21–23.)

---

[6] Riley's declaration indicates that this increase was a mistake; the pay increase should have been $0.55 per hour, consistent with the Compensation Guidelines at that time. (Riley Decl. ¶ 48 n.5.)

9

Medeiros testified that she could have "kept pushing" the issue, but did not want to be retaliated against, or perceived as a "complainer" or a "problem." (*Id.* at 92:4–23.) She was also "worried about pushing too much" because she had three children and did not want to put her job in "jeopardy." (*Id.* at 91:7–15.) Notably, all male Support Managers other than Lloyd at the Fredericksburg store *were paid less* than Medeiros during the relevant time periods. (*See* ECF No. 55-5 at 17–18.)

D.  **Promotional Discrimination Facts**

In 2004, when Medeiros received her annual performance evaluation at the Fredericksburg store, her manager wrote that "Lissa needs to take the next step up in management, she is more than capable." (*Id.* ¶ 62, Ex. 11.) In the space provided for comments, Medeiros wrote, "[n]o comment." (*Id.*) When Walmart implemented Career Preference in 2006, Medeiros never listed MIT or "Assistant Store Manager" as an "Interest" in the system. (*Id.* ¶ 63, Ex. 19.) Further, when Medeiros received her 2006 performance evaluation at the Fredericksburg store, her manager wrote, "Lissa needs to take the next step and go into the training program." (*Id.* ¶ 64, Ex. 11.) Again, Medeiros wrote "[n]o comments." (*Id.*) Finally, in Medeiros's 2009 performance evaluation at the Charlottesville store, her manager again wrote that she should "[m]ove to the next level of management." (*Id.* ¶ 65, Ex. 17.) Medeiros also wrote "[n]o comment" on this evaluation. (*Id.*)

## II.  SUMMARY JUDGMENT STANDARD

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn*

*v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury

could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248).

## III. ANALYSIS

One disparate-treatment claim remains for (1) pay discrimination and (2) promotional discrimination.[7] The court will address each in turn.

### A. Pay Discrimination[8]

There are two ways to establish liability under Title VII for a disparate treatment claim: (1) "demonstrating through direct or circumstantial evidence that [gender] was a motivating factor in the employer's adverse employment action"; or (2) relying on the burden-shifting scheme in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017). The parties agree that this matter falls under the latter burden-shifting scheme.

Under *McDonnell Douglas*, the plaintiff must first establish a *prima facie* case of sex discrimination. *McDonnell Douglas*, 411 U.S. at 802. For a pay disparity claim, the plaintiff must show that "(1) she is a member of a protected class, (2) she performed her job satisfactorily, (3) an adverse employment action occurred, and (4) the circumstances suggest an unlawfully discriminatory motive." *Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir.

---

[7] Before this matter was transferred to the undersigned, there were four additional plaintiffs. Chief Judge Michael F. Urbanski ruled on the motion to dismiss in this matter and dismissed Medeiros's disparate impact claim, among others. (ECF Nos. 32–33.) The court later severed the five plaintiffs' claims, leaving Medeiros as the only plaintiff in this matter. (ECF No. 51.)

[8] In her opposition, Medeiros raises several arguments regarding a disparate *impact* claim. (*See* ECF No. 63 at 15 ("Wal-Mart's deference to managers [*sic*] decision-making ability for awarding pay led to disparate impact on female managers."); *see also id.* ("In appropriate cases, giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate impact theory.").) Because Medeiros's disparate impact claim has been dismissed, the court cabins its analysis to Medeiros's disparate treatment claim. (*See* ECF Nos. 32–33.)

2019). The plaintiff must establish her *prima facie* case by a preponderance of the evidence. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996). If she succeeds, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* Finally, if the defendant does so, the burden shifts back to the plaintiff to show that the defendant's proffered reason is pretextual. *Id.*

Medeiros bases her disparate-treatment claim on two instances: (1) the evaluation in Charlottesville where she received an "Exceeds Expectations" rating as opposed to a "Role Model" rating; and (2) the pay discrepancy between her and her colleague Mr. Lloyd.

### 1.    Performance Evaluation

Walmart correctly argues that Medeiros cannot meet a *prima facie* case of gender discrimination based on the fact that she received an "Exceeds Expectations" rating as opposed to a "Role Model" rating on her 2011 annual performance evaluation. "An adverse action is one that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (internal quotation marks omitted). "Poor" and "unfavorable" performance evaluations "have failed to qualify as adverse employment actions." *Michael v. Va. Commonwealth Univ.*, No. 3:18-cv-125-JAG, 2018 WL 3631888, at *2 (E.D. Va. July 31, 2018) (citing *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 651 (4th Cir. 2002); *Taylor v. Republic Servs., Inc.*, No. 12-cv-523, 2013 WL 487042, at *5–6 (E.D. Va. Feb. 6, 2013)).

Out of five possible ratings—Role Model, Exceeds Expectations, Solid Performer, Development Needed, and Below Expectations—Medeiros received the second highest

rating and a $0.50 raise based on the evaluation. The 2011 performance evaluation contains positive comments and Medeiros's "strengths," and it also contains "areas of opportunity" and "development."[9] Just because Medeiros did not receive her preferred rating does not mean that this evaluation constituted an adverse employment action. Because Medeiros flatly fails to state a *prima facie* case of gender discrimination regarding this incident, no burden shifts to Walmart to articulate a nondiscriminatory reason for her rating, and the court's analysis ends.

### 2. Comparator Charles Lloyd

When a plaintiff relies on a comparator to show a *prima facie* case of discrimination, the comparator must be similarly situated "in all relevant respects." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010). For this inquiry, courts consider whether the employees had the same job description and were subject to the same standards; whether they had comparable experience, education, qualifications, and performance; and whether they had the same supervisor(s). *See Spencer*, 919 F.3d at 207; *see also David v. Winchester Med. Ctr.*, No. 5:16-cv-00063, 2018 WL 310140, at *12 (W.D. Va. Jan. 5, 2018) ("Because [the plaintiff] and [the comparator, Dr. Restrepo] did not report to the same individual, as a matter of law, Dr. Restrepo cannot serve as a comparator."). If the two employees are similar in all relevant respects but have different pay, then an inference arises that the pay differential stems from discriminatory treatment. *See Swaso*, 698 F. App'x at 748.

While Medeiros and Lloyd held the same job title for periods of time in 2005 and

---

[9] Apart from the fact that this evaluation is overwhelmingly positive (and therefore cannot constitute an adverse employment action), none of the comments give any indication that gender was a motivating factor in the rating, but rather focus on Medeiros's work performance (*e.g.*, "Lissa is very focused on tasks and works on holding associates accountable for their assignments"; "Lissa needs to consider the entire store['s] presentation," *et cetera*). (Riley Decl. ¶¶ 52–55, Ex. 17.)

14

2008–2009, Walmart argues that they were not similarly situated in all relevant respects because they had (1) different employment histories within Walmart and (2) different supervisors at all relevant times. Both assertions are correct., and they are determinative.

Prior to Medeiros and Lloyd overlapping as Support Managers in 2005, Medeiros had transferred from the Seekonk, Massachusetts store to the Fredericksburg store in 2001 as an unloader, and she was promoted to Overnight Support Manager in 2002. Lloyd was hired by the Fredericksburg store in 2002 into "Grocery Night Receiving" and transitioned to Overnight Support Manager in 2005. When Medeiros and Lloyd again held the same position in July 2008 through September 2009, again, their employment records show that they held different positions preceding that time. Medeiros kept the same position as Overnight Support Manager, but Lloyd worked as a Dairy Department Manager in 2006 and 2007. Their respective employment records show that Lloyd was making more than Medeiros preceding both time periods when they overlapped as Support Managers, and that they did not have the same managers setting their pay rates. Medeiros's rate was a combination of the pay set by her manager in Seekonk, Massachusetts, which carried over to Fredericksburg; her performance evaluation raises; and the raise that she received from Joel Payne when she was promoted to Support Manager. On the other hand, Lloyd's initial pay as a Support Manager in 2005 was based on his position in Night Receiving, which different managers had set and adjusted, and then a manager named Anthony Jarrell set his pay when Lloyd again became a Support Manager in 2008. These significant differences are sufficient for the court to conclude that Medeiros and Lloyd are not proper pay comparators.

In sum, regarding both purported instances of pay discrimination, Medeiros has not

established a *prima facie* case of sex discrimination and has failed to create any genuine issues of material fact. The court will therefore grant summary judgment in favor of Walmart on Medeiros's pay discrimination claim.

**B.    Promotional Discrimination**

To establish a *prima facie* case of promotional discrimination, a plaintiff must show that: "(1) she is a member of a protected class; (2) her employer had an open position for which she applied or sought to apply; (3) she was qualified for the position; and (4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination." *Evans*, 80 F.3d at 959–60. Medeiros again fails to establish a *prima facie* case.

Medeiros bases this claim on the assertion that she was never selected for Walmart's MIT program to become an Assistant Store Manager. (ECF No. 55-3 at 4–5.) Three undisputed facts in the record fatally undermine her claim. First, on three of her annual performance reviews, the respective managers noted that Medeiros was capable of moving into management, and they encouraged her to do so. (Riley Decl. ¶¶ 62, 64–65, Exs. 11, 17.) Second, Medeiros never applied for the MIT program or the Assistant Store Manager position in Career Preference, Walmart's online career-management system. (*Id.* ¶ 63.) She therefore "could not have been matched to any openings in the training program from that time forward." (*Id.*) Third, and perhaps most importantly, Medeiros admitted in her deposition that she *never* actively pursued a management position. (Medeiros Dep. at 44:6–8 ("Q. Okay, so you didn't approach anybody and speak with them about how you wanted to get promotions? A. That would be correct."); *id.* at 92:24–93:9 ("Q. And then you mentioned . . . being repeatedly passed over for promotions. What promotions were you referring to? A.

16

It would be assistant manager. . . . I was never asked, . . . but the male associates that worked under me, they were encouraged to apply and they were pushed through. Q. Did you ever ask anyone about applying for those positions? A. No."); *id.* at 95:21–24 (In the context of discussing Medeiros's wife's various managerial promotions: "Q. Okay, but you didn't proactively ask anybody whether you could apply for assistant manager position; is that an accurate statement? A. Yes.").)

Medeiros's deposition also establishes that for her two prior promotions (which were not for salaried management positions), her managers asked her to take on additional responsibilities, and she accepted those promotions. (*See id.* at 20:3–15 (Store Manager asked Medeiros to become an unloading supervisor); *id.* at 24:13–25:7 (Store Manager called and asked Medeiros to become an Overnight Support Manager).) Nevertheless, the record establishes that for an associate to move to salaried management through the MIT program—*i.e.*, to become an Assistant Store Manager—she would have to communicate her wishes to management, and after 2006, "apply" in Career Preference. The record conclusively demonstrates that Medeiros never did either of those things, despite being encouraged on multiple occasions to pursue management opportunities.

Medeiros's arguments to the contrary might gain traction in a disparate impact claim, but that cause of action has been dismissed from this lawsuit. Medeiros simply cites broad allegations from her Complaint (*see* ECF No. 63 at 19), and she asserts that male associates were encouraged to apply for Assistant Store Manager positions while she was passed over. But Medeiros cannot cite any evidence to support this allegation; she merely provides unsupported opinions. Such opinions will not pass muster on summary judgment. *See*

17

*Williams v. Giant Food, Inc.*, 370 F.3d 423, 433 (4th Cir. 2004) ("[The plaintiff's] testimony that she believed her evaluations to be 'unfair and untrue and incorrect' is merely a self-serving opinion that cannot, absent objective corroboration, defeat summary judgment."); *CoreTel Va., LLC v. Verizon Va., LLC*, 752 F.3d 364, 370 (4th Cir. 2014) ("[I]t is ultimately the nonmovant's burden to persuade us that there is indeed a dispute of material fact. . . . It must provide more than a scintilla of evidence—and not merely conclusory allegations or speculation—upon which a jury could properly find in its favor." (citation omitted)).

Ultimately, Medeiros's promotional discrimination claim fails because she cannot establish a *prima facie* case of discrimination. Medeiros fails to (1) show that she applied or pursued any managerial position; or (2) provide any evidence giving rise to an inference of gender discrimination. The court will also grant Walmart's motion for summary judgment on Medeiros's promotional discrimination claim.

### IV.  CONCLUSION

For the above reasons, Walmart's motion for summary judgment (ECF No. 54) will be granted. A separate order will issue.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 8th day of April, 2021.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE